Hyung S. Choi, State Bar 015669
CHOI & FABIAN, PLC
90 S. Kyrene Rd., Suite #5
Chandler, Arizona 85226
Tel: (480)517-1400
Fax: (480)517-6955
hyung@choiandfabian.com

Attorneys for Plaintiff

**UNITED STATES DISTRICT COURT**
**DISTRICT OF ARIZONA**

| | |
|---|---|
| Phu Trong Bui,<br><br>　　　Plaintiff,<br><br>　　vs.<br><br>Equifax Information Services LLC;<br><br>　　　Defendant. | Case No.:<br><br>**COMPLAINT** |

## INTRODUCTION

1.  Plaintiff Phu Trong Bui ("Plaintiff") brings this action for damages against Equifax Information Services, LLC ("Equifax") pursuant to the Fair Credit Reporting Act, 15 U.S.C. §§ 1681 *et seq.* (hereinafter "FCRA").

## JURISDICTION AND VENUE

2.  This Court has jurisdiction pursuant to 15 U.S.C. § 1681p.

3.  Venue lies properly in this district pursuant to 28 U.S.C. §1391(b).

1

## THE PARTIES

4. Plaintiff is a resident of Maricopa County, State of Arizona, and is a consumer as defined by the FCRA, 15 U.S.C. § 1681a(c).

5. Equifax is a consumer reporting agency as defined by the FCRA, 15 U.S.C. § 1681a(f).

## THE FAIR CREDIT REPORTING ACT

6. The FCRA requires that credit reporting agencies such as Equifax, in preparing a credit report, to "follow reasonable procedures to assure maximum possible accuracy of the information" in the report. 15 U.S.C. § 1681e(b).

7. The FCRA requires that upon receiving notice from a consumer that the consumer disputes the accuracy or completeness of any item of information in the consumer's file, Equifax follow specific requirements, including:

   (a) conduct a reasonable reinvestigation of the disputed information to determine if the information is accurate;

   (b) notify the source of the information of the dispute within five days;

   (c) provide the source with all relevant information received from the consumer;

   (d) review and consider all relevant information provided by the consumer in conducting the reinvestigation;

   (e) delete or modify information that is found to be inaccurate or incomplete, or that cannot be verified;

(f) complete the reinvestigation within 30 days; and

(g) send the consumer written results of the reinvestigation and a credit report that is based on the consumer's file as that file is revised as a result of the reinvestigation. 15 U.S.C. § 1681i(a).

8. The FCRA requires that Equifax provide a description of the reinvestigation procedure used to determine the accuracy and completeness of the disputed information if requested by a consumer. 15 U.S.C. § 1681i(a)(7).

9. The FCRA requires that upon request of a consumer, Equifax provide the consumer with all information in the consumer's file at the time of the request. 15 U.S.C. § 1681g(a).

10. The FCRA provides that Equifax may only furnish a credit report to a person "which it has reason to believe … intends to use the information in connection with a credit transaction involving the consumer on whom the information is to be furnished." 15 U.S.C. § 1681b(a).

**EQUIFAX'S SYSTEMATIC PROBLEM OF MIXING INFORMATION**

11. The policies and procedures of Equifax do not insure compliance with these provisions of the FCRA.

12. A major problem with Equifax's procedures is the "mixed file."

13. A mixed file is placing information belonging to one consumer into the file or credit report of a different consumer.

14. In some cases, the two consumers are merged together so there is one file for both consumers.

15. Equifax's procedures for matching consumer information to a consumer file regularly result in the mixing of one consumer with another.

16. Mixed files create a false description of a consumer's credit history. Further, mixed files result in the consumer not obtaining the credit or other benefits of our economy that they are entitled to.

17. Consumers with mixed files often have their confidential personal and financial information wrongfully disclosed when the other consumer is seeking credit, and have their confidential information disclosed to the other person.

18. Mixed files violate the consumer's privacy and also greatly increases their risk of identity theft.

19. Mixed files are not a new phenomenon. Equifax has been aware of mixed files for more than 35 years. *See Thompson v. San Antonio Retail Merchants Ass'n,* 682 F.2d 509 (5th Cir. 1982).

20. Mixed files occur despite consumers' unique personal identifying information, such as Social Security numbers.

21. Equifax's matching logic allows information to be included in a consumer's file even when the Social Security number reported with the information is different than the Social Security number on the consumer's file.

22. Equifax knows its matching procedures are causing inaccurate credit reports and mixed files.

23. In the 1990's, the Federal Trade Commission ("FTC") filed a lawsuit against Equifax because of its failure to comply with the FCRA including the mixing of consumers' files.

24. In the 1990's, the Attorneys General of a number of states filed a lawsuit against Equifax because of its failure to comply with the FCRA including the mixing of consumers' files.

25. In 1992, Equifax signed an Agreement of Assurances with the State Attorneys General, and agreed to take specific steps to prevent the occurrence of mixed files and to adopt procedures designed specifically to reinvestigate consumer disputes that result from mixed files.

26. In 1995, Equifax signed a Consent Order with the FTC.  To prevent the occurrence of a mixed file, Equifax is not to place information in a consumer's file (other than certain public record information) unless Equifax has identified such information by at least two of the following identifiers: (i) the Consumer's name; (ii) the Consumer's Social Security Number, (iii) the Consumer's date of birth, (iv) the Consumer's account number with a Subscriber or a similar identifier unique to the Consumer.

27. Equifax continues to repeatedly mix consumers' files despite its agreements with the FTC and State Attorneys General, and hundreds of lawsuits filed against it by consumers whose files have been mixed.

28. Over the last ten years, Equifax has been sued many hundreds of times by consumers whose files were mixed with a different consumer by Equifax.

29. In *Miller v. Equifax Information Services, LLC*, 2014 U.S. Dist. LEXIS 69450 (D. Or. 2014), the jury found that Equifax willfully violated the accuracy and reinvestigation requirements in the FCRA, Sections 1681e(b) and 1681i(a), and awarded $18.4 million in punitive damages.

30. In *Miller*, it was undisputed that Equifax merged Miller's credit file with the file of a different person who had the same name and a similar Social Security number as Miller but who lived in a different state and who had a negative credit record and a significantly different credit record than Miller had.

31. In *Miller*, Margaret Leslie, Vice President of Equifax's Technology Area, testified that this kind of file-merger was a "reasonable combination" that occurs with "regularity."  Miller Trial Transcript 583.

32. In *Williams v. Equifax Information Services, LLC,* Case No. 48-2003-CA-9035-0 (Orange County, Florida 2007), the jury awarded $2.7 million in punitive damages for Equifax's willful violations of the FCRA in mixing the credit file of Angela Williams with a different consumer.

33. In *Cardenas v. Equifax Information Services, LLC*, CV051300 PHX SRB (D. Ariz. 2005), a Maricopa County resident brought claims under the FCRA against Equifax based on its mixing of his information with his sibling.

34. Despite federal law, Congressional mandates, federal and state government enforcement actions, and hundreds of consumer lawsuits, Equifax's mixed files remain a significant problem for consumers, including Plaintiff.

35. Equifax's sale of consumers' most private and sensitive personal and financial information results in billions of dollars in revenue to Equifax annually.

## EQUIFAX'S REFUSAL TO SEPARATE PLAINTIFF AND HIS BROTHER'S INFORMATION

36. Plaintiff is among the victims of Equifax's mixed files.

37. Equifax mixed Plaintiff's credit and personal information with information belonging to his brother, although they have different names, different Social Security numbers, and different dates of birth.

38. As a result, Equifax prepared and sold numerous credit reports that included both Plaintiff and his brother's information, resulting in Plaintiff suffering damages.

39. Plaintiff did not discover this mixing of information until December 2015, when he tried to figure out why he could not obtain his Equifax credit report from a credit monitoring service company.

40. Plaintiff repeatedly disputed to Equifax telling it that it was reporting information that belonged to his brother, but Equifax would not correct its false reporting or stop the mixing.

41. The other two national credit reporting agencies, Trans Union and Experian, did not mix Plaintiff's credit file with his brother.

42. In February 2015, Plaintiff's healthcare insurance provider Anthem had its data breached.

43. As a result, Plaintiff signed up for Allclear ID ("Allclear") protection service.

44. In April or May 2015, Plaintiff requested his credit reports from Trans Union, Experian, and Equifax.

45. In response, Plaintiff received a letter from Equifax dated May 14, 2015 requesting identification documents.

46. Plaintiff responded by sending a copy of his social security card and driver's license.

47. Equifax still did not provide him with his report.

48. Equifax sent Plaintiff a letter dated June 6, 2015 letter again requesting identification documents, which Plaintiff had already provided.

49. Frustrated, Plaintiff turned to Allclear for help.

50. In September 2015, Plaintiff spoke with Rebecca Moore at Allclear.

51. Rebecca Moore provided Plaintiff with a code he could use to obtain a 3-in-1 credit report from www.transunionmonitoring.com which would include his

credit reports from all three national credit reporting agencies – Trans Union, Experian, and Equifax.

52. Plaintiff used the code and obtained a 3-in-1 credit report, dated September 13, 2015. The report included information from Trans Union and Experian but did not include any information from Equifax. The information from Trans Union and Experian was accurate.

53. On or about December 2, 2015, Plaintiff called Allclear, who then called Equifax in a 3 way conference call with Plaintiff. Equifax refused to talk with Allclear on the line. So, Plaintiff spoke with Equifax alone. Plaintiff first spoke with "Hope." Plaintiff was then transferred to her supervisor "Jay." During this call, Plaintiff was told that his file was mixed. This was the first time that Plaintiff learned of the mixing or that there might be inaccurate information on his Equifax credit report. Jay told Plaintiff to fax a letter with supporting documents to "Equifax Mixed File Department" and provided a fax number.

54. On December 2, 2015, Plaintiff sent a fax to Equifax. He requested that it fix the mixed file information on his credit report. He also requested that Equifax update its database with his correct name and social security number, which he provided. Plaintiff also faxed Equifax a copy of his driver's license and social security card.

55. Plaintiff also invited Equifax to ask him any questions and provided his email and telephone number.

56. The next day, Plaintiff called Equifax to follow up and spoke with "Jessica." He asked if Equifax received his fax. Jessica said she will check and call him back. She never called back.

57. Plaintiff never heard from Equifax in response to his December 2, 2015 fax.

58. Following the December 3, 2015 conversation with Jessica at Equifax, Plaintiff also spoke with Amadeus, Lavare, and Raul from Allclear.

59. On December 4, 2015, Allclear requested certain documents from Plaintiff which would allow it to "move forward with the creditors and/or credit reporting agencies."

60. In December 2015, Plaintiff sent the requested documents to Allclear.

61. Plaintiff continued working with Allclear in February and April of 2016.

62. Upon information and belief, Allclear, on Plaintiff's behalf, contacted Equifax and requested it stop mixing Plaintiff's information with and another person.

63. In April 2016, Plaintiff received a letter from Equifax dated April 12, 2016 purporting to show "results of your reinvestigation request" along with his Equifax credit report dated April 12, 2016.

64. The April 12, 2016 Equifax credit report showed that Plaintiff's file was still mixed. The report listed numerous credit accounts and other personal information that did not belong to Plaintiff, including information that belonged to Plaintiff's brother.

65. The April 12, 2016 Equifax credit report indicated that Plaintiff's credit report and information had been sent to various companies that he had not done business with.

66. Plaintiff continued to work with Allclear to resolve the problem.

67. Upon information and belief, Allclear again communicated with Equifax on Plaintiff's behalf and again requested that it not mix Plaintiff and another person's information

68. Plaintiff received a letter from Equifax dated August 1, 2016 purporting to show the "results of your reinvestigation request." The Equifax letter stated:

> We have reviewed the identification information. The results are: Please submit a copy of your driver's license or birth certificate to update your date of birth. Name: Phu Trong Bui Ssn: XXX-XX-XXXX Birthdate: 8/XX/1967
>
> We have reviewed your concerns and our conclusions are: The disputed date of birth 08/XX/57 is not currently reporting on the Equifax credit file.
> [Social security numbers and birth dates redacted].

69. Equifax was requested information Plaintiff had already provided, because he had faxed Equifax his driver's license showing the date of birth in September of 1969, and that he never told Equifax that his birthdate was in August of 1967.

70. In addition, Plaintiff never "disputed date of birth 08/XX/1957."

71. Nevertheless, on or about August 17, 2016, Plaintiff sent another dispute letter to Equifax and enclosed a copy of his driver's license (showing the date of birth

11

in September of 1969), social security card, and W-2 showing his name, address and social security number.

72. In the letter, Plaintiff explained in detail the difference between his name and his brother's name (and the cultural reason behind the similarity in the names), the different birth dates, different social security numbers, and job history.

73. Plaintiff requested Equifax fix the mixing of his information with his brother's information and send him an accurate copy of his credit report.

74. Plaintiff also provided his email addresses and cell phone number and invited Equifax to contact him with any questions.

75. Equifax never called Plaintiff or contacted him via email.

76. Instead, Equifax sent Plaintiff a letter dated August 28, 2016 stating that it "placed an initial fraud alert" on Plaintiff's credit file due to Plaintiff's request.

77. Plaintiff also received a letter from Equifax dated September 19, 2016 with "Results of Your Investigation." Equifax stated that it had "verified" information as belonging to him although the information was not his. It again asked him to submit a copy of his driver's license to update his date of birth although he had just sent it to Equifax with his dispute in August 2016. Equifax stated that the former employment information of "Honeywell" had been deleted from his credit file. But the credit file that Equifax sent with the letter still listed Honeywell as his former employer. Equifax also stated that the

disputed employer linkedin.com was not reporting on his credit file. But Plaintiff never disputed linkedin.com or claimed that it was on his file.

78. Equifax enclosed Plaintiff's credit file date September 19, 2016. The Equifax letter told Plaintiff to "review it for any unauthorized accounts or inquiries." The letter also told Plaintiff to contact the credit grantors that are reporting fraudulent information, ask them to explain their fraud investigation process, what steps should be taken, and request a letter or documents stating the results of the investigation; and to forward the letter to Equifax.

79. Plaintiff, however, never claimed that any credit grantor was reporting fraudulent information on his Equifax credit file.

80. Instead, Plaintiff told Equifax it was reporting his brother's information on his Equifax credit report, and provided detailed information Equifax should have used to differentiate Plaintiff from his brother.

81. The September 19, 2016 Equifax credit report listed at least 34 accounts that did not belong to Plaintiff, along with his brother's birth date, last employment and previous employment.

82. That credit report also indicated that Equifax had provided Plaintiff's credit report and information to various companies that he had not done business with.

83. On or about September 29, 2016, Plaintiff sent another detailed dispute letter to Equifax. In the letter, Plaintiff explained the differences between his

13

information and his brother's information, provided a copy of his driver's license, social security card, and 2014 W-2, denied that he made any request for a fraud alert or claimed that anyone committed any fraud. He enclosed a copy of the September 19, 2016 Equifax report and told Equifax that he had circled the accounts that belong to him and that he did not recognize the other accounts. He also enclosed a copy of his Experian credit report which was accurate, that he told Equifax it could use for reference.

84. Plaintiff again requested Equifax stop mixing his brother's information in his credit file.

85. Plaintiff informed Equifax that he had never requested fraud alert and was not claiming fraud, especially not by his brother.

86. Plaintiff requested that Equifax remove the fraud alert and notify TransUnion and Experian that Plaintiff had not made such a request.

87. Plaintiff provided his email addresses and cell phone number and again invited Equifax to contact him with any questions.

88. Equifax never called Plaintiff or contacted him via email.

89. Instead, Plaintiff received a letter from Equifax dated October 26, 2016, with the results of the reinvestigations, along with his October 26, 2016 Equifax credit report.

90. The letter with the results of the reinvestigations listed three accounts and stated that Equifax "verified" those items belong to Plaintiff. But these were

14

not the accounts that Plaintiff had disputed. These accounts were ones that Plaintiff told Equifax that he had marked and belonged to him. Equifax had obviously not even read his dispute letter. In his letter, he stated that he had circled the accounts that belonged to him and did not recognize the other accounts. He circled 7 accounts. In response, Equifax "verified" the first 3 circled accounts as items belonging to Plaintiff. Thus, Equifax simply verified what Plaintiff had already identified as his accounts. Curiously, Equifax did not reinvestigate the remaining 4 accounts that Plaintiff had circled.

91. Equifax ignored Plaintiff's disputes of the 34 credit accounts.

92. Equifax ignored Plaintiff's disputes of the employment information listing Honeywell and Motorola.

93. Equifax ignored Plaintiff's dispute of his brother's birth date.

94. Equifax ignored Plaintiff's request to remove the fraud alert.

95. The October 26, 2016 Equifax credit report still listed Plaintiff's date of birth in August of 1967, which was his brother's date of birth.

96. The October 26, 2016 Equifax credit report still listed Plaintiff's last reported employment as Motorola and his previous employment as Honeywell.

97. The October 26, 2016 Equifax credit report still included an "extended fraud alert" despite Plaintiff's specific request that it be removed.

98. The October 26, 2016 Equifax credit report still listed 34 credit accounts that did not belong to Plaintiff and most likely belong to his brother.

15

99. Equifax again told Plaintiff to review to the report "for any unauthorized accounts or inquiries," although Plaintiff had clearly advised Equifax that the errors were based on the mixing of his file and Plaintiff had never claimed file contained any unauthorized accounts or inquiries. In fact, Plaintiff specifically stated in his September 29, 2016 dispute letter that he was "not alleging any fraud by anyone, especially his brother."

100. On or about December 9, 2016, Plaintiff sent Equifax a letter requesting his Equifax credit report, and again explaining that Equifax was mixing him with his brother and providing both his and his brother's identifying information so Equifax could unmix the file.

101. Plaintiff received his Equifax credit report dated December 19, 2016.

102. The December 19, 2016 Equifax credit report contained substantially the same wrong information that Equifax had reported in September and October 2016.

103. On March 27, 2017, Plaintiff called Equifax in another attempt to get his report corrected. He spent approximately 1 hour and 40 minutes on the phone with an Equifax representative. Plaintiff explained his history of disputes, and provided the different identification information for himself and his brother. Plaintiff requested that Equifax unmix his and his brother's information. Plaintiff identified all the accounts that were not his, as well as the accounts that belonged to him. Equifax told him that his disputes would be sent out to the creditors and he would get a response within 30 days.

104. Plaintiff then received Equifax's letter dated April 23, 2017 letter showing the results of his disputes along with his April 23, 2017 Equifax credit report.

105. The April 23, 2017 Equifax credit report still listed Plaintiff's brother's birth date, the brother's former employers, and the brother's credit accounts.

106. After having disputed numerous times to get his report corrected without success, Plaintiff brings this lawsuit in a further attempt to get Equifax to unmix his file and publish an accurate report for him.

107. In late 2016, Plaintiff considered obtaining a mortgage on his house to purchase land to build his next family home. Plaintiff consulted with a mortgage broker company called Lending Specialist. The representative of Lending Specialist advised Plaintiff that he would have to clear up the mixed file by Equifax in order to qualify for a conventional mortgage.

108. As a result of Equifax's continued mixing of Plaintiff and his brother's information, and Equifax's refusal to correct the problem, Plaintiff suffered actual damages, including mental anguish and anxiety, along with physical symptoms such as occasional insomnia, anger, loss of appetite, and stomach problems.

109. Equifax's failures to comply with the FCRA were willful and reckless in that Equifax mixed Plaintiff's file despite knowing it procedures resulted in mixed files and agreeing that it would change those procedures but failing to do so, having notice that it was continuing to mix files through hundreds of lawsuits,

being found to have willfully violated the FCRA but refusing to change its procedures to comply with the FCRA, refusing to unmix Plaintiff's file after it knew it was mixed, refusing to reinvestigate Plaintiff's disputes and follow the procedures in the FCRA in its handling of Plaintiff's disputes, refusing to provide Plaintiff with a copy of his report despite numerous requests, and wrongfully furnishing Plaintiff's reports and information to persons who were not involved in any transaction with Plaintiff.

## **FIRST CLAIM FOR RELIEF**

(Negligent Noncompliance with FCRA)

110. Plaintiff realleges and incorporates paragraphs 1 through 110.

111. Equifax negligently failed to comply with the requirements of the FCRA, including but not limited to, 15 U.S.C. § 1681b, § 1681e, § 1681g, and § 1681i.

112. As a result of Equifax's failure to comply with the requirements of the FCRA, Plaintiff has suffered and continues to suffer, actual damages, including economic loss, denial of credit, lost opportunity to receive credit, damage to reputation, invasion of privacy, emotional distress, physical injury, and interference with Plaintiff's normal and usual activities for which Plaintiff seeks damages in an amount to be determined by the jury.

113. Plaintiff requests attorneys' fees pursuant to 15 U.S.C. § 1681o(a).

## SECOND CLAIM FOR RELIEF

(Willful Noncompliance with FCRA)

114. Plaintiff realleges and incorporates paragraphs 1 through 110.

115. Equifax willfully failed to comply with the requirements of the FCRA, including but not limited to, 15 U.S.C. § 1681b, § 1681e, § 1681g, and § 1681i.

116. As a result of Equifax's failure to comply with the requirements of the FCRA, Plaintiff has suffered and continues to suffer, actual damages, including economic loss, denial of credit, lost opportunity to receive credit, damage to reputation, invasion of privacy, emotional distress, physical injury, and interference with plaintiff's normal and usual activities for which Plaintiff seeks damages in an amount to be determined by the jury.  Plaintiff also seeks punitive damages in an amount to be determined by the jury.

117. Plaintiff requests attorneys' fees pursuant to 15 U.S.C. § 1681n(a).

## JURY TRIAL DEMAND

118. Plaintiff demands a jury trial on all claims.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for judgment against Defendant as follows:

On the First Claim for Relief:

1. Actual damages to be determined by the jury; and

2. Attorneys' fees.

On the Second Claim for Relief:

1. Actual damages to be determined by the jury;

2. Punitive damages to be determined by the jury; and

3. Attorneys' fees.

On All Claims for Relief:

1. Costs and expenses incurred in the action.

DATED November 29, 2017.

                                    Respectfully submitted,

                                    */s/ Hyung S. Choi*
                                    Hyung S. Choi, State Bar 015669
                                    CHOI & FABIAN, PLC
                                    90 S. Kyrene Rd., Suite #5
                                    Chandler, Arizona  85226
                                    Attorneys for Plaintiff